HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BASSAM YUSUF KHOURY, et al.,

          Plaintiffs,

      v.

NATHALIE ASHER, et al.,

          Defendants.

CASE NO. C13-1367RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on three motions:  Plaintiffs' motion to certify a class, their motion for a preliminary injunction on behalf of that class, and Defendants' motion to dismiss for failure to state a claim.  Although the parties requested oral argument, oral argument is unnecessary as to the rulings the court makes in this order. For the reasons stated below, the court GRANTS Plaintiffs' motion for class certification (Dkt. # 2) and DENIES Defendants' motion to dismiss (Dkt. # 28).  The court directs the clerk to TERMINATE Plaintiffs' motion for a preliminary injunction.  Dkt. # 14.  The parties shall meet and confer in accordance with this order to determine if Plaintiffs are satisfied that the declaratory relief that the court issues today will suffice to afford complete relief to Plaintiffs and the class they represent.  If necessary, the court will conduct a hearing to determine whether to impose a permanent injunction to ensure that Defendants heed the court's declaratory ruling.

ORDER – 1

## II.  BACKGROUND

**A.      Plaintiffs Were Each Subject to Mandatory Detention As a Result of the Department of Homeland Security's Interpretation of 8 U.S.C. § 1226(c).**

The federal government routinely locks away certain aliens who are in removal proceedings, denying them bond hearings via the so-called "mandatory detention" authority in a provision of the Immigration and Naturalization Act ("INA").  8 U.S.C. § 1226(c)(2).  Department of Homeland Security ("DHS") officials arrest these aliens; the Department of Justice immigration courts who oversee the confinement of aliens deny them bond hearings.  In the government's view, an alien who has committed an offense on a list at § 1226(c)(1) is subject to mandatory detention pending the resolution of removal proceedings.  There can be no serious question that some of these aliens present no risk to their communities and no risk of flight, because some of them have been living in this country for decades and have families and careers.  What the government thinks about a law that locks away peaceable family members without release, the court can only guess.  What is certain is that the government takes the position that Congress tied its hands when it enacted the mandatory detention scheme.  It asserts that it *must* detain these aliens without bond, regardless of whether that is remotely sensible immigration policy.  But this case is not about whether mandatory detention makes sense; it is about whether the government properly interprets the detention mandate of § 1226(c).  The government's interpretation follows the interpretation of the Board of Immigration Appeals ("BIA") in *In re Rojas*, 23 I. & N. Dec. 117, 125 (BIA 2001), where the BIA determined that any alien who had committed a listed offense was subject to mandatory detention pending the completion of removal proceedings.

The Plaintiffs in this case are aliens who DHS locked away in the Northwest Detention Center ("NWDC"), an alien detention facility located in this judicial district.  DHS locked Bassam Yusuf Khoury away in April 2013, and did not release him on bond until October 2013.  DHS locked Alvin Rodriguez Moya away in April 2013, and did not release him on bond until October 2013.  DHS locked Pablo Carrera Zavala away in

ORDER – 2

1    April 2013 and released him on bond in August 2013 after it decided that he was not
2    actually subject to mandatory detention.  Asher Decl. (Dkt. # 36-1) ¶ 9.  DHS
3    commenced removal proceedings for each Plaintiff at about the time it took them into
4    custody.  So far as the court is aware, those proceedings have not reached a resolution
5    even though they have been pending for nearly a year.
6           At the risk of understatement, the court observes that locking people up without
7    bond hearings presents substantial Due Process concerns.  The Supreme Court has held
8    that the mandatory detention scheme of § 1226(c) is not a per se violation of the Due
9    Process Clause of the Fifth Amendment.  *Demore v. Kim*, 538 U.S. 510, 531 (2003).  The
10   Court grounded its holding, however, in its view that the average period of mandatory
11   detention would be six weeks (the average time to complete removal proceedings in
12   which the alien did not appeal) or "about five months" (in the event that the alien
13   appealed an adverse removal ruling).  *Id.* at 530.  In *Rodriguez v. Robbins*, 715 F.3d
14   1127, 1137 (9th Cir. 2013), the court detailed Ninth Circuit rulings establishing that
15   "*Demore*'s holding is limited to detentions of brief duration."  In light of those rulings,
16   the *Rodriguez* court upheld an injunction requiring aliens subject to mandatory detention
17   within the Central District of California to receive a bond hearing within six months, and
18   to be released on bond unless the government demonstrates that the alien presents a
19   danger to the community or a risk of flight.  *Id.* at 1131.  It the government's apparent
20   deference to *Rodriguez* and the precedent cited therein that allowed Mr. Khoury and Mr.
21   Rodriguez to win release on bond after six months of mandatory detention.
22          Release after six months of mandatory detention is better than no release at all, but
23   Plaintiffs argue that it is unlawful nonetheless.  To understand their argument and the
24   government's counterargument, the court considers in detail Plaintiffs' encounters with
25   the mandatory detention scheme of § 1226(c).
26
27
28   ORDER – 3

Each Plaintiff committed a state crime, was convicted, and served his sentence. Each was released. Each returned to his family and community. Each was arrested years later by agents from Immigration and Customs Enforcement ("ICE"), an agency within DHS. Mr. Khoury, a native of Palestine and lawful permanent resident of the United States since 1976, was released from state custody in June 2011 after serving a 30-day sentence on a drug charge. ICE agents arrested him in April 2013. Mr. Rodriguez, a native of the Dominican Republic and a lawful permanent resident of the United States since 1995, served the non-suspended portion of a three-year sentence on a drug charge and was released in August 2010. ICE agents arrested him in April 2013. Mr. Carrera, a native of Mexico who has lived in the United States since 1998, finished a 60-day sentence in February 2003. ICE agents arrested him in April 2013.

No one disputes, at least for purposes of this case, that Plaintiffs were deemed removable for committing crimes within the scope of 8 U.S.C. § 1226(c), the subsection of the INA that authorizes mandatory detention. Congress amended § 1226 as part of the Illegal Immigration Reform and Immigration Responsibility Act of 1996. In section 303 of that Act, it revised the existing detention scheme for aliens subject to removal and imposed a mandatory detention requirement for some of those aliens. It allowed for a transition period to implement mandatory detention. After two years in which the government operated under transitional rules, § 1226(c) took effect in 1998. *Saysana v. Gillen*, 590 F.3d 7, 10 n.2 (1st Cir. 2009). Its first paragraph provides as follows:

    (1)    Custody

        The Attorney General[1] shall take into custody any alien who—

        (A)    is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

---

[1] The Secretary of Homeland Security is now the official who bears the duties that Congress assigned to the Attorney General in § 1226(c). *See* 6 U.S.C. § 557 (describing catchall transfer-of-duty to Secretary of Homeland Security in the wake of the creation of that Department).

ORDER – 4

(B)   is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), A(iii), (B), (C), or (D) of this title,

(C)   is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

(D)   is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

That Mr. Rodriguez and Mr. Khoury committed an offense listed in subparagraphs (A) through (D) is not in dispute, at least not in this case. DHS's initial determination that Mr. Carrera committed one of those offenses was apparently an error, albeit one that DHS did not correct until Mr. Carrera had been confined for four months.

The first paragraph of § 1226(c) does not mandate detention without bond. The next paragraph does, at least in some circumstances:

(2)   Release

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides [that the alien's release is necessary to protect a witness in a major criminal investigation].

In other words, unless he meets an exceedingly narrow witness-protection exception that is not at issue in this case, every alien "described in paragraph (1)" is statutorily ineligible for release from DHS custody in advance of the resolution of his removal proceedings.

By contrast, § 1226 ensures that all aliens who are not "described in paragraph (1)" are eligible for release on bond. Its first paragraph declares that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States," but elaborates that "except as provided in subsection (c)," aliens detained pending removal may be released on bond or conditional parole. § 1226(a)(2).

ORDER – 5

Plaintiffs contend that they are not subject to mandatory detention because they are not aliens "described in paragraph (1)" because ICE agents took them into custody well after their release from state custody, not "when [they were] released," as paragraph (1) requires. In their view, mandatory detention in accordance with § 1226(c)(2) is available only for aliens who have committed an offense described in paragraphs (A) through (D) *and* who were taken into ICE custody immediately upon their release from state custody. DHS disagrees, taking the position that § 1226(c) mandates detention of any alien who committed an offense described in paragraphs (A) through (D), regardless of when ICE took the alien into custody.

**B.    Plaintiffs' Statutory Interpretation Claim Is Ripe for a Final Ruling.**

Before considering the merits of each party's interpretation of § 1226, the court reviews the procedural posture of this action.

Plaintiffs sued the Secretary of Homeland Security, a host of ICE officials responsible for detaining aliens in the Western District of Washington, and the warden at the NWDC. In addition, they sued the Attorney General in his capacity as head of the Department of Justice, as well as the Director of the Executive Office for Immigration Review ("EOIR"). The EOIR encompasses both the BIA, which is the Justice Department agency responsible for interpreting and applying immigration laws, as well as the immigration courts who preside over alien bond hearings. The Department of Justice and EOIR are Defendants because they abet DHS's execution of its interpretation of mandatory detention. Although aliens in mandatory detention are not entitled to bond hearings, they may receive hearings before an immigration judge where they can contest whether they are properly subject to mandatory detention. 8 C.F.R. § 1003.19(h)(2)(ii); *In re Joseph*, 22 I. & N. Dec. 799, 805 (BIA 1999) (explaining that the "purpose of the regulation . . . is to provide an alien . . . with the opportunity to offer evidence and legal authority on the question whether [DHS] has properly included him within a category that is subject to mandatory detention"). Each of the three Plaintiffs appeared at this

ORDER – 6

hearing, each argued that he was not subject to mandatory detention because DHS did not take him into custody when he was released from state custody, and each received a ruling from an immigration judge that he was nonetheless subject to mandatory detention. Throughout this order, the court uses the term "the government" to apply to Defendants collectively.

Plaintiffs styled their suit as both a petition for writs of habeas corpus on their own behalf and as a suit for declaratory and injunctive relief not only on their own behalf, but on behalf of a class of all aliens who are or will be detained without bond as a result of the government's expansive view of § 1226(c) mandatory detention. They stated two claims for relief: one that the government violates § 1226(c) by subjecting them to mandatory detention; and one that mandatory detention, as the government envisions it, violates the Due Process Clause.

Plaintiffs have not only filed a motion to certify that class, but also a motion for a preliminary injunction that would require the government to provide bond hearings in accordance with § 1226(a) within 30 days of an alien's arrest. A motion for a preliminary injunction requires, among other things, that the Plaintiffs demonstrate that they are likely to succeed on the merits of their claims. The government, not content simply to argue in opposition to the injunction motion that Plaintiffs are unlikely to succeed on the merits, filed a motion to dismiss Plaintiffs' suit for failure to state a claim. Plaintiffs countered by moving for summary judgment and a permanent injunction. The government was prepared to file a cross-motion for summary judgment before the parties reconsidered their more-motions-are-better approach. They agreed that this case turns not on disputed facts, but on a "pure question of law" – specifically the interpretation of § 1226(c). Gov't Mot. (Dkt. # 37) at 3. The parties further agreed that unless the court found a dispute of material fact, it could enter permanent injunctive relief if it resolved that pure question of law in Plaintiffs' favor. Oct. 7, 2013 ord. (Dkt. # 38).

ORDER – 7

1      The parties focus virtually all of their attention on Plaintiffs' claim that DHS

2   misinterprets § 1226(c).  In their motion to dismiss, Defendants made a cursory effort to

3   target Plaintiffs' Due Process claim, contending that *Demore* has put that claim to rest.

4   Plaintiffs scarcely responded.  Although the parties were never explicit, it is possible that

5   their agreement to focus on the "pure issue of law" that their statutory interpretation

6   dispute raises represents an agreement to leave Plaintiffs' Due Process claim for another

7   day.  In any event, the parties have done so little to address that claim that the court will

8   not address its merits.  For the remainder of this order, the court will ignore Plaintiff's

9   Due Process claim and treat this case as if it raised only a challenge to the government's

10   interpretation of § 1226(c).  This order will conclude with instructions to Plaintiffs to

11   indicate whether they still wish to pursue their Due Process claim.

12      The procedural route to relief thus cleared of obstacles, the court now turns to the

13   issue at the heart of this case: does § 1226(c) permit the government to subject to

14   mandatory detention aliens who it arrested months, years, or (in Mr. Carrera's case) more

15   than a decade after their release from state custody?

## III.   ANALYSIS

### A.   Section 1226(c)(2) Unambiguously Conditions Mandatory Detention on DHS Custody That Commences Immediately Upon the End of Non-DHS Custody.

The interpretation of a statute is a question of law whose answer begins with an

examination of the plain meaning of the statute.  *United States v. Gomez-Osorio*, 957

F.2d 636, 639 (9th Cir. 1992).  Words in a statute take on their "ordinary, contemporary,

common meaning," unless the statute otherwise defines them.  *Miranda v. Anchondo*, 684

F.3d 844, 849 (9th Cir. 2012) (citation omitted).  The court must read the words of a

statute "in their context and with a view to their place in the overall statutory scheme."

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2001); *see also United*

*States v. Morton*, 467 U.S. 822, 828 (1984) ("[W]e do not . . . construe statutory phrases

in isolation; we read statutes as a whole.").  If the statutory language is unambiguous, and

ORDER – 8

1    the statutory scheme is coherent and consistent, that is the end of the court's

2    interpretative inquiry.  *Miranda*, 684 F.3d 844, 849 (9th Cir. 2012).  The parties debate to

3    what extent the court must defer to the BIA's interpretation of § 1226(c) in *Rojas*.  But it

4    is settled that a court owes no deference to any agency's statutory interpretation unless

5    the statute fails to clearly express the intent of Congress.  *Chevron USA, Inc. v. Natural*

6    *Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *INS v. Cardoza-Fonseca*, 480 U.S.

7    421, 447-48 (1987) ("The judiciary is the final authority on issues of statutory

8    construction and must reject administrative constructions which are contrary to clear

9    congressional intent.").

10            There are two potential ambiguities in § 1226(c).  One is the meaning of the

11   phrase "when the alien is released" in § 1226(c)(1).  That phrase might mean something

12   akin to "at the moment of release."  It might also mean "at any time after release."  The

13   other potential ambiguity arises from the interrelationship of paragraphs (1) and (2) of

14   § 1226(c).  Paragraph (2), which is the sole authority for mandatory detention, applies

15   only to "an alien described in paragraph (1)."  If an alien "described in paragraph (1)" is

16   merely an alien who has committed one of the offenses listed in subparagraphs (1)(A)

17   through (1)(D), then mandatory detention is available regardless of when DHS takes an

18   alien into custody.  That was the view of the BIA in *Rojas*.  But if an alien "described in

19   paragraph (1)" is an alien who has both committed one of the enumerated offenses *and*

20   has been taken into DHS custody "when . . . released" from non-DHS custody, the timing

21   of the DHS arrest (and the meaning of "when . . . released") is critical to determining

22   whether the alien is subject to mandatory detention.  As the court will soon discuss,

23   neither of these potential ambiguities is an actual ambiguity: the meaning of both phrases

24   is plain in the context of § 1226.

25

26

27

28   ORDER – 9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.   No Binding Precedent Dictates this Court's Interpretation of § 1226(c), But Many Courts Have Considered the Issue.

In considering these potential ambiguities, the court does not write on a blank slate.  The Ninth Circuit, unfortunately, has yet to interpret § 1226 in a manner that bears on its interpretation in this case.  Three other federal appeals courts have.  Two of them, in turn, have at least acknowledged the BIA's 2001 interpretation in *Rojas*.  There, a majority of the en banc BIA concluded that the phrase "an alien described in paragraph (1)" includes only those aliens described in subparagraphs (1)(A) through 1(D).  23 I. & N. Dec. at 125.  The BIA did not decide what "when . . . released" means.

In *Hosh v. Lucero*, 680 F.3d 375, 378 (4th Cir. 2012), the Fourth Circuit purported to defer to the BIA's interpretation of § 1226 in *Rojas*.  But it did not.  Instead, it interpreted the meaning of "when the alien is released," concluding that although the command to arrest certain criminal aliens "'when . . . released' from other custody connotes some degree of immediacy," it could not "conclude that Congress clearly intended to exempt a criminal alien from mandatory detention and make him eligible for release on bond if the alien is not *immediately* taken into federal custody."  *Id.* at 381 (emphasis in original).  Alternatively, the *Hosh* court concluded that even if it were to interpret "when . . . released" more stringently, § 1226(c) specifies no consequence for a failure to arrest an alien "when . . . released," and thus does not prohibit mandatory detention for qualifying aliens arrested after their release from non-DHS custody.  *Id.* at 381 ("[E]ven if we assume that the statute commands federal authorities to detain criminal aliens at their exact moment of release from other custody, we still conclude that a criminal alien who is detained *after* that exact moment is not exempt from mandatory detention.") (emphasis in original).

In *Sylvain v. Attorney General of the United States*, 714 F.3d 150 (3d Cir. 2013), the Third Circuit focused its attention on whether § 1226(c) conditions mandatory detention on the timing of an alien's arrest.  It concluded that it does not.  *Id.* at 157 ("Even if the statute calls for detention 'when the alien is released,' . . . nothing in the

ORDER – 10

statute suggests that immigration officials lose authority if they delay."). It noted that the *Hosh* court had not deferred to the BIA's interpretation of "an alien described in paragraph (1)" in *Rojas*, and had instead crafted its own interpretation of "when . . . released" in § 1226(c)(1). *Sylvain*, 714 F.3d at 157 n.9.

Before *Sylvain* and *Hosh* addressed the issue at the heart of this case, the First Circuit addressed a different interpretative question arising from § 1226(c) in *Saysana v. Gillen*, 590 F.3d 7 (1st Cir. 2009). The *Saysana* court rejected the BIA's determination that an alien released from custody for an offense described in subparagraphs (1)(A) through (1)(D) *before* the effective date of § 1226(c) could nonetheless be subject to mandatory detention if he was released *after* the effective date from custody for an offense beyond the scope of those subparagraphs. *Id.* at 18. As the court will later discuss, in reaching that conclusion, the *Saysana* court interpreted § 1226(c) in a way that implicitly rejects the BIA's holding in *Rojas*. Indeed, even the BIA, which issued the decision that led to the First Circuit's ruling, interpreted § 1226(c) in a way that implicitly rejects its holding in *Rojas*.

While the Ninth Circuit has yet to address the interpretation of § 1226(c), its district courts have resoundingly rejected the government's position. From the enactment of § 1226(c) in 1996 to the present, almost every district court to consider that position – that the government can arrest aliens who have committed an offense described in § 1226(c)(1) whenever it prefers and subject them to mandatory detention – has rejected it. The Honorable William J. Dwyer of this District was among the first to consider the issue, albeit in the context of transitional rules that applied between the enactment of § 1226(c) in 1996 and its effective date in 1998. *Pastor-Camarena v. Smith*, 977 F. Supp. 2d 1415 (W.D. Wash. 1997). He concluded that the transitional rules made mandatory detention applicable only to aliens taken into federal custody immediately after their release from non-federal custody. *Id.* at 1418. Since then, every judge in this District has reached the same conclusion as to § 1226(c). *E.g.*, *Quezada Bucio v. Ridge*,

ORDER – 11

317 F. Supp. 2d 1221, 1231 (W.D. Wash. 2004) ("[T]he mandatory detention statute . . . does not apply to aliens who have been taken into immigration custody several months or several years after they have been released from state custody.") (Theiler, M.J.); *Castillo v. ICE Field Office Dir.*, 907 F. Supp. 2d 1235, 1240 (W.D. Wash. 2012) (reaching same conclusion, declining to follow *Hosh*) (Pechman, J.); *Deluis-Morelos v. ICE Field Office Dir.*, No. C12-1905JLR, 2013 U.S. Dist. LEXIS 65862, at *13, 22 (W.D. Wash. May 8, 2013) (reaching same conclusion, declining to follow *Hosh* or *Sylvain*).  Other district courts in the Ninth Circuit are in accord.  *E.g.*, *Mejia Espinoza v. Aitken*, No. 5:13-cv-512EJD, 2013 U.S. Dist. LEXIS 34919, at *13-16, 21 (N.D. Cal. Mar. 13, 2013) (citing various district court rulings).  The court is aware of just one district court within the Ninth Circuit who has ruled to the contrary.  *Quiroz Gutierrez v. Holder*, No. 13-cv-5478-JST, 2014 U.S. Dist. LEXIS, at *24-25 (N.D. Cal. Jan. 2, 2014) (following *Sylvain*).  Although district courts outside the Ninth Circuit have usually rejected the government's position, some have not.  *See Sylvain*, 714 F.3d at 156 & n.5-6 (listing district courts around the country who have adopted or rejected government's view of mandatory detention); *Gordon v. Johnson*, No. 13-cv-30146-MAP, 2013 U.S. Dist. LEXIS 181980, at *22 (D. Mass. Dec. 31, 2013) (citing cases).

Considering the foregoing precedent as persuasive authority, and paying particular attention to the views of the First, Third, and Fourth Circuits, the court rules as follows. First, the mandatory detention authority provided in § 1226(c)(2) unambiguously applies only to aliens who have been detained "when . . . released" from state custody.  The court does not agree with the BIA's determination in *Rojas* that the phrase "alien described in paragraph (1)" is ambiguous, and thus the court does not defer to the BIA's interpretation of that phrase.  Second, an alien is detained "when . . . released" only if DHS detains him immediately upon his release from non-DHS custody for an offense specified in subparagraphs (1)(A) through (1)(D).  Third, for any alien taken into federal custody at a time other than "when . . . released" from state custody, § 1226 unambiguously requires

ORDER – 12

that the alien be given an opportunity to win release on bond.  To summarize, only aliens who have *both* committed an offense specified in subparagraphs (1)(A)-(1)(D) and have been taken into DHS custody immediately upon their release from non-DHS custody for one of those offenses are subject to mandatory detention.  The court now explains its conclusions.

> ### 2.      An Alien "Described in Paragraph (1)" is An Alien Who Has Both Committed a Qualifying Offense and Been Taken Into Federal Custody "When . . . Released" From State Custody.

So far as the court is aware, no court has ever adopted the holding from *Rojas*:

> We construe the phrasing "an alien described in paragraph (1)," as including only those aliens described in subparagraphs (A) through (D) of section [1226(c)(1)], and as not including the "when released" clause.

23 I & N Dec. at 18.  That is with good reason, because *Rojas* interprets § 1226(c) in a way that makes the release of the alien from non-DHS custody irrelevant.  Were *Rojas* an accurate interpretation of the law, the government could subject to mandatory detention any alien who committed an offense described in subparagraphs (1)(A) through (1)(D).  No one, not even the BIA, believes that to be a fair reading of the statute.  In *In re Saysana*, 24 I. & N. Dec. 602, 604 (BIA 2008), the BIA explained as follows:

> The "released" language of section [1226(c)(1)] of the Act is not expressly tied to any other language that would clarify whether it refers to release from criminal custody, DHS custody, or some other form of detention. However, we have interpreted this language to include a release from a non-DHS custodial setting after the expiration of the [transitional rules preceding the effective date of the amendments to § 1226].

That explanation was integral to the BIA's holding that an alien who committed an offense described in subparagraphs (1)(A) through (1)(D) was subject to mandatory detention so long as the government detained him after release from *any* non-DHS custody, even custody for an offense beyond the scope of those subparagraphs.  *Id.* at 608.  But if the BIA believed that it correctly interpreted § 1226(c) in *Rojas*, its ruling in *Saysana* was unnecessary.  If *Rojas* was rightly decided, then *Saysana* required nothing

ORDER – 13

more of the BIA than a simple statement that it makes no difference when or whether an alien is released from non-DHS custody or for what crime, because the only precondition to mandatory detention (according to *Rojas*) is commission of a crime listed in subparagraphs (1)(A) through (1)(D).

No court has even suggested that it could decouple mandatory detention from the requirement that an alien first be released from custody.  When the First Circuit considered the habeas petition of the alien detained in the wake of *Saysana*, the court squarely rejected the notion that mandatory detention does not depend on a prior release from custody.  The court explained that a "natural reading" of § 1226(c) "makes clear that the congressional requirement of mandatory detention is addressed to the situation of an alien who is released from custody for one of the enumerated offenses [of subparagraphs (1)(A) through (1)(D)]."  *Saysana*, 590 F.3d at 13.  Along the way, it rejected the government's argument that it should be able to detain any alien who committed an offense listed in subparagraphs (1)(A) through (1)(D), even if that offense never resulted in a form of non-DHS custody.  *Id.* at 14.  It explained that "the plain language of the statute does not render the term 'when released' meaningless as applied to the[] subsections [of § 1226(c)(1)] that do not require a conviction."  *Id.*  The *Saysana* court recognized that an alien who committed an offense described in subparagraphs (1)(A) through (1)(D) but never came into non-DHS custody would not be subject to mandatory detention.  *Id.*  It nonetheless declined to adopt the "strained" reading of the statute that the government preferred.  *Id.*

Although the *Hosh* court purported to follow *Rojas*, its holding was merely that mandatory detention did not require DHS to "*immediately*" detain an alien upon his release from non-DHS custody.  680 F.3d at 381.  Had *Hosh* followed *Rojas*, it would simply have held that release from non-DHS custody is not a precondition of mandatory detention.  The *Sylvain* court, acknowledging that the *Hosh* court did not actually follow

ORDER – 14

*Rojas*, declined to "take a stand on th[e]" issue of whether *Rojas* was rightly decided. 714 F.3d at 157 & n.9.

This court concludes that § 1226(c) unambiguously conditions the availability of mandatory detention on an alien's release from non-DHS custody. *Rojas* is entitled to no deference. An alien "described in paragraph (1)" is an alien who both committed a predicate offense *and* was taken into DHS custody "when . . . released" from non-DHS custody.

### 3.   Mandatory Detention Is Available Only When DHS Takes an Alien Into Custody Immediately Upon His Release From Non-DHS Custody.

Having concluded that an alien's release from non-DHS custody is a precondition to mandatory detention, it remains to decide what it means that DHS must take the petitioner into custody "when the alien is released." Reading this phrase without statutory context, it is possible to interpret it in a variety of ways. At one extreme, it could mean "at the moment the alien is released"; at the other, it might mean "at any time after the alien is released." *See*, *e.g.*, Gov't Mot. (Dkt. # 28) at 9 (offering various dictionary definitions of "when"); *Hosh*, 680 F.3d at 379-80 (reviewing dictionary definitions of "when"). But read in the context of § 1226 as a whole, the latter interpretation cannot stand. The phrase "when . . . released" appears not in a description of conditions of mandatory detention, it appears in a mandate that the government "shall take into custody" any alien who has committed certain offenses. § 1226(c)(1). A mandate is meaningless if those subject to it can carry it out whenever they please. "Take out the trash when you get home," is not at all the same as "take out the trash at any time after you get home, even months or years later." The Fourth Circuit recognized as much in *Hosh*, concluding that the mandate "connotes some degree of immediacy," 680 F.3d at 381, but that it did not require DHS custody to follow immediately after non-DHS custody. This interpretation cannot withstand scrutiny.

ORDER – 15

That § 1226(c) mandates detention without bond for certain aliens is proof enough that the mandate requires immediate detention.  Many courts considering the import of the mandate have looked to the statute's legislative history, observing that Congress was concerned that deportable criminal aliens often committed additional crimes before their removal and that many of them failed to appear for removal hearings.  *See Hosh*, 680 F.3d at 381 (citing discussion of § 1226(c)'s legislative history from *Demore*, 538 U.S. at 518).  But it is not necessary to know *why* Congress wanted immediate detention of certain aliens without the possibility of bond to know that it did want it.  Congress created a non-mandatory detention scheme in § 1226(a).  Any deportable alien, including those who committed an offense enumerated in subparagraphs (1)(A) through (1)(D), is subject to non-mandatory detention.  That is to say that any alien subject to removal can be taken into custody when DHS prefers.  It defies logic to imagine that Congress would have created a parallel system of mandatory detention without bond for certain categories of aliens while permitting the government to give, through inaction, the very unsupervised freedom that the mandate was designed to eliminate.  A mandate to take an alien subject to mandatory detention into DHS custody "at some undetermined point after the alien is released from non-DHS custody" is not mandatory detention at all, or at least it is not all the mandatory detention scheme that Congress imposed.

Because the court finds that a requirement of anything other than immediate DHS custody following release from non-DHS custody is inconsistent with the mandatory detention scheme that Congress created in § 1226, the court finds that the requirement that the government take custody "when the alien is released" is a requirement for detention immediately following release from non-DHS custody.

### 4.  The Statute Recognizes that Ordinary Detention is Sufficient for Aliens Who Are Not Taken into DHS Custody "When Released" from Non-DHS Custody.

In the court's view, the strongest argument in favor of the broad mandatory detention scheme that the government advocates is one that the *Hosh* and *Sylvain* courts

ORDER – 16

1    recognized: better late than never.  Put in more lawyerly fashion, a mandate that the

2    government shall act at a specified time is not, without more, a prohibition on acting after

3    that time.  *Sylvain*, 714 F.3d at 158.  Congress presumably issues mandates for the benefit

4    of a particular segment of the public, and thus it is typically inadvisable to interpret a

5    mandate to deprive that segment of that benefit merely because of "[b]ureaucratic

6    inaction – whether the result of inertia, oversight, or design . . . ."  *Id.* at 158.

7         The so-called "better-late-than-never principle," *Sylvain*, 714 F.3d at 158 (quoting

8    *United States v. Dolan*, 571 F.3d 1022, 1027 (10th Cir. 2009)), is a sensible canon of

9    statutory interpretation when a contrary interpretation would deprive the intended

10   beneficiaries of the benefits of a statute.  That is not so in the case of mandatory

11   detention.  By failing to detain an alien subject to mandatory detention immediately after

12   his release from non-DHS custody, DHS has *already* deprived the public of the benefits

13   of mandatory detention.  It has allowed an alien to walk free for days, weeks, months, or

14   years, when Congress believes that alien presents such a presumptive risk of danger or

15   flight that he should be immediately confined upon his release from non-DHS custody.

16   Moreover, once an alien has left non-DHS custody, the need for a *presumption* of danger

17   or risk of flight is reduced or nonexistent.  *Saysana*, 590 F.3d at 17 ("[I]t stands to reason

18   that the more remote in time a conviction becomes and the more time after a conviction

19   an individual spends in a community, the lower his bail risk is likely to be.").  In the time

20   since the alien's release, he has either evaded custody or he has not, and he has either

21   demonstrated himself to be a danger to the community or he has not.  He has, in other

22   words, given either himself or the government the fodder for a bond hearing.[2]

23

24   [2] The government contends that a deportable alien has no incentive to flee until he knows the
     government has begun removal proceedings against him.  That contention presumes that aliens
25   who have committed crimes listed in subparagraphs (1)(A) through (1)(D) are unaware of the
     potential immigration consequences.  The court is unwilling to make that presumption.
26   Moreover, if Congress had wanted to condition mandatory detention upon the commencement or
     removal proceedings, it certainly could have done so.  Instead, it conditioned it upon a release
27   from non-DHS custody.  In any event, the government ignores that an alien is as much a danger
     to the community before removal proceedings have begun as after.
28   ORDER – 17

Conditioning mandatory detention on DHS custody immediately upon release from non-DHS custody does not deprive the public of the benefit of detention, because detention remains available via § 1226(a).  The DHS's failure to meet that condition deprives the public of whatever additional benefit inures in mandatory detention.

Both the *Hosh* and *Sylvain* courts took guidance on their application of the better-late-than-never principle from *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990). There, the Court considered whether the government lost the authority to detain a criminal defendant without bail when it failed to hold a detention hearing within the time specified by statute.  *Id.* at 714-15.  The Court concluded that the mandatory hearing deadline did not "operate to bar all authority to seek pretrial detention once the time limit has passed."  *Id.* at 718.  But consider the distinction between *Montalvo-Murillo* and this case: in *Montalvo-Murillo*, the government would have lost all power to detain the defendant before trial; in this case the government loses nothing, it merely has to present its case for pre-removal detention at a bond hearing.  The "better-late-than-never" principle is not itself a mandate, it is merely a specific application of the mandate to construe a statute consistent with its design and purpose.  *See id.* at 719.  In the context of § 1226, the availability of ordinary bond hearings is a satisfactory alternative to mandatory detention in cases where DHS has already foregone the benefits of mandatory detention through failure to detain the alien upon his release from non-DHS custody.

There is little question that Congress was aware that some aliens who commit offenses described in subparagraphs (1)(A) through (1)(D) would avoid mandatory detention and receive ordinary bond hearings.  To begin, as even the BIA acknowledges, Congress allowed all aliens who had committed such offenses and been released prior to the 1998 effective date of the amendments to § 1226(c) to avoid mandatory detention. *Saysana*, 24 I. & N. Dec. at 604; *Saysana*, 590 F.3d at 17 n.6 ("[I]n crafting the new provisions, Congress . . . made explicit that only releases after the effective date would trigger mandatory detention.").  This is further proof that Congress viewed a release from

ORDER – 18

non-DHS custody as a prerequisite of mandatory detention, as the court discussed in Part III.A.2, *supra*.  But it also demonstrates that Congress did not view ordinary bond hearings as an invariably unacceptable outcome for aliens who committed the listed crimes.  *Saysana*, 590 F.3d at 17 ("Congress was no doubt aware that, under some circumstances, aliens with criminal histories that predate the passage of IIRIRA remain eligible for forms of relief not available to aliens with more recent criminal convictions.").  Also escaping mandatory detention are aliens who commit offenses described in subparagraphs (1)(A) through (1)(D), but are not taken into non-DHS custody.  For example, aliens who engage in terrorism are "inadmissible under section 1182(a)(3)(B)," as set out in subparagraph (1)(D).  But, if DHS arrests an alien who has "under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity," 8 U.S.C. § 1182(a)(3)(B)(i)(III), *before an entity other than the DHS has taken the alien into custody*, the alien must receive an ordinary bond hearing.  Congress could have avoided this result with ease by declaring that any alien who commits an offense enumerated in subparagraphs (1)(A) through (1)(D) is subject to mandatory detention.  Instead, it tied mandatory detention to a release from non-DHS custody.  This is proof enough that Congress was not concerned with a comprehensive mandatory detention scheme tied to certain offenses, but rather concerned with creating a scheme that ensured that aliens who committed certain offenses could be transferred seamlessly from non-DHS custody to mandatory detention.  *See Gordon*, 2013 U.S. Dist. LEXIS 181980, at *17 ("The obvious goal was to ensure the direct transfer of potentially dangerous and elusive individuals from criminal custody to immigration authorities.").

For all of these reasons, the court concludes that § 1226(c) unambiguously dictates that only aliens who have committed offenses listed in subparagraphs (1)(A) through (1)(d) *and* have been taken into DHS custody immediately upon their release from non-DHS custody for one of those offenses are subject to mandatory detention.

ORDER – 19

**B.**     **Plaintiffs Have Met the Requirements to Certify a Rule 23(b)(2) Class.**

Plaintiffs ask the court to certify a class defined as follows:

> All individuals in the Western District of Washington who are or will be subject to mandatory detention under 8 U.S.C. § 1226(c) and who were not taken into immigration custody at the time of their release from criminal custody for an offense referenced in § 1226(c)(1).

The court modifies that definition slightly, to emphasize that class members are aliens who the government *asserts* are subject to mandatory detention, not necessarily aliens who actually are subject to mandatory detention.  It also modifies the phrase "at the time of" to emphasize that DHS custody must occur immediately upon release from non-DHS custody.

> All individuals in the Western District of Washington who the government asserts or will assert are subject to mandatory detention under 8 U.S.C. § 1226(c) and who were not taken into immigration custody immediately upon their release from criminal custody for an offense referenced in § 1226(c)(1).

The court's decision to certify a class is discretionary.  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009).  Rule 23 of the Federal Rules of Civil Procedure guides the court's exercise of discretion.  A plaintiff "bears the burden of demonstrating that he has met each of the four requirements of Rule 23(a) and at least one of the [three] requirements of Rule 23(b)."  *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 724 (9th Cir. 2007).  Rule 23(a) requires a plaintiff to demonstrate that the proposed class is sufficiently numerous, that it presents common issues of fact or law, that it will be led by one or more class representatives with claims typical of the class, and that the class representatives will adequately represent the class.  *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 161 (1982); Fed. R. Civ. P. 23(a)(1)-(4).  If a plaintiff satisfies the Rule 23(a) requirements, she must also show that the proposed class action meets one of the three requirements of Rule 23(b).  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  Plaintiffs in this case invoke only Rule 23(b)(2), which requires them to show that "the party opposing the class has acted or refused to act

ORDER – 20

on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

The government scarcely opposes Plaintiffs' motion for class certification. It does not, for example, dispute that the class is sufficiently numerous. Plaintiffs knew of at least a dozen aliens at the time they moved for class certification who were being detained without a bond hearing as a result of the government's misinterpretation of § 1226(c). It knew of at least a dozen more who had been wrongfully detained in the past two years. Given that most aliens at the NWDC have no counsel, it is safe to assume that there are many more class members. Moreover, the DHS has done nothing to assure Plaintiffs or the court that it will not continue to take into custody aliens after their release from non-DHS custody and subject them to mandatory detention. The class is sufficiently numerous both as to aliens currently subject mandatory detention at the NWDC and as to aliens who the government will subject to mandatory detention at the NWDC. There is no dispute that the joinder of all of these class members as plaintiffs would be impracticable, as Rule 23(a)(1) requires.

Each class member's statutory claim presents questions of law or fact common to the class. The relevant factual questions are the same for every class member. Is the government holding the alien in mandatory detention (or will it seek to do so)? If so, did the government arrest the alien immediately upon his release from non-DHS custody for an offense described in subparagraphs (1)(A) through (1)(D)? The court has already answered the legal question dispositive of each class member's claim: may the government lawfully subject to mandatory detention aliens for whom the answer to the second question is "no"?

The government also contends that Plaintiffs' claims (and the defenses to those claims) are not typical of the class. That argument, however, depends on the government's view that the amount of time between a class member's release from non-DHS custody and DHS's eventual arrest of the class member is relevant to whether he is

ORDER – 21

1    subject to mandatory detention.  It is not.  Plaintiffs are typical of class members in the

2    only way that matters: they are in mandatory detention even though DHS did not take

3    them into custody immediately upon their release from non-DHS custody.

4            The government contends that Plaintiffs are inadequate class representatives for

5    the same reason that their claims are allegedly atypical.  That contention does not

6    withstand scrutiny, as the court has just explained.  Plaintiffs are, however, atypical of

7    many class members in that they have now secured their release on bond, by virtue of the

8    government's adherence to the six-month limit on mandatory detention from *Rodriguez*

9    and the authority on which *Rodriguez* relies.  Even the government acknowledges,

10   however, that at least Mr. Khoury and Mr. Rodriguez may take advantage of an exception

11   to the mootness doctrine that ensures that courts can review "transitory claims" of class

12   representatives.  *See Haro v. Sebelius*, No. 11-16606, 2014 U.S. App. LEXIS 61, at *21

13   (9th Cir. Jan. 2, 2014).  Here, the government's adherence to *Rodriguez* ensured that Mr.

14   Rodriguez's and Mr. Khoury's mandatory detention ended after six months, thereby

15   placing them squarely within the transitory claim exception.  The court concludes that all

16   three Plaintiffs are adequate class representatives.[3]

17           What remains is to consider Rule 23(b)(2), which permits a court to certify a class

18   for injunctive or declaratory relief when that relief would apply equally to all class

19   members.  Here, there is no question that all class members will benefit equally from the

20   court's declaration that the government may not subject an alien to mandatory detention

21   via § 1226(c) unless the government took the alien into custody immediately upon his

22   release from custody for an offense described in subparagraphs (1)(A) through (1)(D).

23

24   _____

[3] Mr. Carrera's mandatory detention ended after four months when DHS decided that he was not
25   actually subject to mandatory detention, regardless of the government's erroneous interpretation
     of the mandatory detention statute.  Before that, however, he was plainly subject to mandatory
26   detention because of the government's erroneous interpretation of § 1226(c), and his claim is
     plainly transitory.  The court is aware of nothing that would make Mr. Carrera an inadequate
27   class member.  Even if the court were mistaken, Mr. Rodriguez and Mr. Khoury can adequately
     represent the class.

28   ORDER – 22

**C.    The Court Will Impose Only Declaratory Relief At This Time, Although It Will Consider Injunctive Relief If Necessary.**

As the court has explained, there are no barriers to entry of final relief on the merits of Plaintiffs' statutory claim.  The court queries, however, whether it is necessary to impose a permanent injunction in addition to the classwide declaratory relief that the court has already awarded.  The import of the court's declaration is plain: the government violates the law to the extent it continues to subject to mandatory detention aliens who it did not take into custody at the proper time.  The court has no reason to expect that the government will not take appropriate action to end its violation of the law.

Accordingly, rather than impose an injunction, the court today will issue only its declaratory ruling.  The government will have two weeks from today to assess how it will respond to that declaration.  No later than March 26, 2014, it shall meet and confer with counsel for Plaintiffs to reveal its plans for complying with the law.  If Plaintiffs are unsatisfied with those plans, or if they believe for another reason that injunctive relief is necessary, they may file a statement of five pages or fewer explaining their position.  They must file that statement no later than April 2, 2014.  Alternatively, the parties may by the same deadline file a stipulated motion for a permanent injunction or a statement that they agree that injunctive relief is unnecessary to afford complete relief to the class.  Finally, the parties shall meet and confer to discuss what, if anything, Plaintiffs wish to do to pursue their Due Process claim to judgment.  The parties shall share their views on that subject in a joint statement they file no later than April 2, 2014.  They may combine that statement with any other pleading they file on April 2.

## IV.  CONCLUSION

For the reasons previously stated, the court GRANTS Plaintiffs' motion for class certification (Dkt. # 2) and certifies as class as defined in this order.  The court DENIES Defendants' motion to dismiss.  Dkt. # 28.  The court directs the clerk to TERMINATE Plaintiffs' motion for injunctive relief (Dkt. # 14), without prejudice to renewing a request for a permanent injunction in accordance with this order.

ORDER – 23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The court issues the following declaratory ruling on behalf of the class:  The government may not subject an alien to mandatory detention via 8 U.S.C. § 1226(c) unless the government took the alien into custody immediately upon his release from custody for an offense described in subparagraphs (1)(A) through (1)(D) of § 1226(c).

DATED this 11th day of March, 2014.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 24